**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-17-00493-CR**
_____

**MAYCOL DOUGLAS LAGOS-VALLADARES, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 359th District Court**
**Montgomery County, Texas**
**Trial Cause No. 15-12-13675-CR**

**MEMORANDUM OPINION**

A jury convicted Appellant Maycol Douglas Lagos-Valladares (Lagos or

Appellant) of aggravated assault on a public servant and assessed punishment at

forty years of confinement. *See* Tex. Penal Code Ann. § 22.02(b)(2)(B) (West

1

2019).[1] In a single issue, Appellant argues that the trial court erred by admitting extraneous acts evidence. We affirm.

## Background

A grand jury indicted Lagos for

> . . . on or about December 26, 2015, . . . while using or exhibiting a deadly weapon, to-wit: a motor vehicle, intentionally, knowingly or recklessly caus[ing] bodily injury to Michael Chapman, a public servant lawfully discharging a public duty, and the defendant knew that Michael Chapman was a public servant[.]

Lagos pleaded "not guilty." The case was tried to a jury in December 2017, and the jury found Lagos guilty.

### Testimony of Law Enforcement Officers

Officer Michael Chapman, with the Conroe Police Department, testified that while working the night shift on December 25, 2015, he was called to West End Lumber where he saw the front gate was open and a white Silverado was exiting. According to Chapman, the driver "kind of paused[,]" and after Chapman yelled at him to get out of the vehicle, the driver accelerated and sped off. At that point, Chapman decided to pursue the fleeing vehicle, and as he was getting into his vehicle, still with one leg outside, he saw a tan Silverado truck coming at him.

---

[1] We cite the current statutes as subsequent amendments do not affect our disposition.

Chapman was taken to the hospital and learned that he had broken his tibia as well as his fibula. Chapman explained that he had two surgeries, he returned to light duty first and later to patrol.

Sergeant Jeremy Allen, a patrol supervisor with the Conroe Police Department, testified that he had retrieved data and analyzed the airbag module from the Silverado that had been abandoned at a Burlington Coat Factory (Burlington) and towed to the Conroe Police Department on or about December 29, 2015. According to Allen, when Chapman's vehicle was struck, the vehicle was in park, and the impact created a "substantial hit[.]" Allen also testified that data from the Silverado showed the truck was at "100 percent throttle" and did not have the brake depressed in the eight seconds before impact. Allen testified that he "believe[d] the individual operating this truck purposefully struck Officer Chapman's patrol car while [Chapman] was standing in the doorway."

Detective Jessie Minchew, a detective with the Conroe Police Department, testified that, while on duty on Christmas night of 2015, he heard officers get dispatched to West End Lumber, and when he learned an officer had been injured, he headed to the location. Minchew agreed that the front and rear doors on the driver's side of Chapman's vehicle were "severely dented and severely damaged[.]"

3

Detective Minchew testified that bolt cutters and several packs of roofing shingles were found on the ground in front of Chapman's vehicle.

On the day after the incident, Detective Minchew observed a tan Chevrolet truck in the Burlington parking lot, not far from West End Lumber, with a suspicious wheel, and the truck matched one of the trucks in the incident in which Officer Chapman was injured. Minchew observed roofing shingles in the bed of the truck that were the same brand observed on the ground at West End Lumber the previous night. According to Minchew, there was extensive damage to the front of the Chevrolet truck and the driver's window, and Minchew observed blue and white paint transfer on the truck, consistent with the color of Chapman's police vehicle. Based on his observation of the tan truck, Minchew had a reasonable suspicion that the Chevy truck from the Burlington parking lot was the truck that had hit Officer Chapman, and the truck was towed to the Conroe Police Department as evidence in the case.

Detective Mitchell with the Conroe Police Department, testified that, after Officer Minchew discovered the tan Chevy Silverado, Mitchell and his partner went to Burlington to ask about the vehicle towed from the parking lot and to view the store's surveillance video. Mitchell explained that the managers at Burlington said there was a group of people in the store at that time asking about the same vehicle.

4

The manager pointed out two of the people to the officers and Mitchell and his partner made contact with them. Mitchell identified himself and another detective talking with the store manager in surveillance video from the store as well as the suspects, including Lagos, his girlfriend, Eric Flores, and Junior Medina. Mitchell also learned of Karla Pereyra after interviewing Flores and Medina at the police station, and Pereyra gave Mitchell and Detective Davis information about Lagos and what Lagos said and did the night Officer Chapman was injured.

Detective Bret Irvine, with the Conroe Police Department, testified that the case "beg[a]n to fall together once a tan Silverado was found in the Burlington [] parking lot[,]" "catty-corner" to the location where Officer Chapman was struck. Irvine testified that the truck had front-end damage and was loaded with roofing shingles. According to Irvine, the temporary tag on the vehicle showed it was registered to Douglas Elisado Lagos Sanchez in Houston.

Irvine testified that Eric Flores and Lariza Delacruz—Lagos's girlfriend—consented to the police downloading information from their phones. Irvine verified Lagos's cell phone number, and he obtained the cell site information in certain exhibits that were admitted into evidence. Irvine also testified that he verified a phone number for Juan Vargas, whom he identified as one of the individuals involved in the incident and driving one of the vehicles. Irvine agreed that, after

5

arresting Lagos and searching his phone, he identified a contact for Juan Vargas and confirmed that calls were made from Lagos's phone five times between 1:00 a.m. and 1:30 a.m. the morning of December 26th. Irvine testified that the cell phone records for Lagos's phone show the location of the cell phone towers about half a mile from West End Lumber. Irvine identified State's Exhibit 87 as a summary he created from the cell phone records that show outgoing calls from Lagos, including calls to Juan, Karla, and Lariza. Irvine testified that, during the same timeframe the cell phone pinged on Lagos's phone, there were also pings on Juan Vargas's phone at the same tower.

According to Irvine, his investigation determined that Juan Vargas was the driver of the white truck. Irvine testified that "Juan Vargas had a Facebook profile with two different white Chevy Silverados that both showed the license plate on the picture that he had." Irvine testified that another officer took a statement from Karla Pereyra, and after that statement, Lagos was arrested pursuant to a warrant.

Sergeant Mark Brockhoeft testified that he was a patrol sergeant and supervisor for the Shenandoah Police Department and that his patrol duties in The Woodlands area include making traffic stops and "looking for anything suspicious." Brockhoeft agreed he was working on patrol on the night of October 9, 2015. Over

6

objection by the defense, Brockhoeft testified that, at about 3:30 in the morning, he saw something suspicious:

Q. What did you see?

A. About that time, I was watching for anything suspicious, out of the ordinary. I was watching southbound traffic. And I saw a white truck pulling a trailer that was loaded down with -- it looked like roofing materials. I saw a bunch of roofing fell out from the back of this pickup. I didn't really think anything of it. I figured it was a work truck. They were southbound. I watched them enter the main lanes southbound and go south.

Q. Did you see anything that was -- that added to your suspicions, if any, following that white truck with the trailer?

A. Shortly after, I want to say about a minute or 2, I saw a gold color pickup truck. It was a half-ton pickup, older model, and it was being followed by a little red or maroon car. I didn't think anything of it until I saw the truck. And it was loaded down with roofing materials, as well.

Q. And when you mean -- and is -- roofing materials, explain to us how they were stacked?

A. From where I could see, it looked like a pallet was stacked in the back of this pickup truck. And you could tell that it had a lot of weight.

Q. How could you tell that? For those of us who don't know what you're looking for, how do you know, as a public servant, as a police officer, when you say something is loaded too heavy?

A. The rear-end of the pickup was almost dragging the ground.

Q. Okay. Are there also times for people that do ride-alongs and things, if you're doing drug interdiction as one of your proactive approaches in law enforcement, are you trained to see, also, weighed-down vehicles sometimes that may have -- and not this case, but sometimes the

7

weighed-down vehicles may tell you there may be some contraband or something?

A. Correct.
Q. So, you noticed this. How were the, if any, were -- these roofing supplies, were they properly secured?

A. I would say it was unsafe, yes. I could say it was unsafe.

Brockhoeft testified that he believed the way the roofing materials were stacked in the back of the Chevy pickup was unsafe because the vehicle was having a hard time "maintaining lane." Brockhoeft identified Lagos as the person operating the vehicle that night. According to Brockhoeft, in his experience, roofing materials were commonly stolen from construction sites in the middle of the night. According to Brockhoeft, the vehicle was towed because neither Lagos nor his passenger had a valid driver's license. Brockhoeft agreed that the VIN of the truck Lagos drove on October 9, 2015, matched the VIN of the vehicle associated with the current case involving Officer Chapman. Brockhoeft agreed that he never learned about any complainant for the shingles or roofing materials in the truck.

Testimony of Lagos's Associates

Karla Pereyra testified that she was a friend of Lagos, who she explained goes by "Brayan[.]" Pereyra testified that Brayan called her at home on the night of December 25, 2015, asking her to pick him up in The Woodlands because his truck "got messed up,[]" and after he sent her his location in The Woodlands through

8

Facebook, she picked him up. Pereyra identified State's Exhibits 82, 83, and 84 as photographs of her phone showing Facebook communications with "Brayan Lagos," in which the defendant sent her his GPS location, and a copy of a Facebook page for Brayan Lagos, which Pereyra identified as the defendant's Facebook page. According to Pereyra, Lagos told her "he had run over a cop[]" after a police officer had shown up while he and others were stealing roofing materials, and that he wanted to go back to see if he was alive, and if he was, he would shoot him.

Juan Vargas agreed that in January 2017, he pleaded guilty to aggravated assault of a public servant and received a reduced charge and a sentence of thirteen years contingent upon his cooperation and truthful testimony. Vargas identified Lagos as someone who was with him on the night that Officer Chapman was injured. Vargas testified that on Christmas of 2015, he received a call from Lagos about 8:00 or 9:00 in the evening. According to Vargas, Lagos said "we were going to a place[,]" a warehouse or roofing place, and they "were going only to steal the material[.]" Vargas testified he was driving a white Silverado truck that night and that Lagos was driving a gray Silverado. Vargas stated that upon arrival at the warehouse, another man who had ridden with him broke the fence using the bolt cutters pictured in State's Exhibit 19 after which the men started loading material into one of the trucks. According to Vargas, after about ten minutes, the police

arrived, Vargas got in his truck and left, and Lagos left "a little bit later[.]" Vargas agreed that Lagos called him afterwards and said he had crashed the patrol car, his truck was not working well, and said "that he hit the police officer . . . he left him there lying there. And they would go back to hit him again."

Lagos's Testimony

Lagos agreed he spent December 25, 2015, at home and that about 5:00 or 6:00 p.m., he gave his keys to Lenin as he had agreed to let Lenin borrow his truck. Lagos testified that he went to see an old girlfriend about 10:00 that night, after which Karla Pereyra picked him up because he had lent out his vehicle. Lagos also spoke with other people that evening trying to get a ride. Lagos testified that Pereyra took him to Junior Medina's apartment, that Lagos also called Vargas because he needed a car to go home, that Vargas drove him back home, and Lagos went to sleep.

Lagos testified that, the next day, he called Lenin to find out what happened to his truck, and Lagos went to the Burlington store to look for his truck but did not find it. Lagos testified that he spoke with a store manager outside the Burlington store, but the manager did not know about his truck. According to Lagos, the Houston police came to his apartment that night and asked if he was the person in the photograph at Burlington, and after he agreed he was, he was arrested and taken to the Conroe Police station. Lagos testified that no one had admitted to him that

10

they had struck a police officer, that they had been stealing shingles, or that they had wrecked his vehicle.

According to Lagos, when Sergeant Brockhoeft stopped him on October 9, 2015, he had been working at a house in Conroe and was heading to a warehouse and then home, and that he had gotten the shingles from the contractor with whom he was working.

## Issue

In a single issue, the Appellant argues that the trial court abused its discretion by admitting certain extraneous acts evidence over his objection. Specifically, Appellant contends the trial court erred in allowing the testimony of Sergeant Brockhoeft that he stopped Appellant in October 2015 when Appellant was driving a truck loaded with roofing shingles. Appellant argues that this extraneous conduct evidence is barred by Rule 404(b) and that there were not enough similarities between the October stop and the offense charged for the extraneous conduct evidence to be admitted under any exception to the Rule. Appellant also argues that admission of this evidence violated Texas Rule of Evidence 403.

## Standard of Review

An appellate court reviews a trial court's ruling on the admission of evidence for an abuse of discretion. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App.

11

2019) (citing *Rodgers v. State*, 205 S.W.3d 525, 527 (Tex. Crim. App. 2006); *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001)). The trial court abuses its discretion when it acts without reference to any guiding rules and principles or acts arbitrarily or unreasonably. *Id.* (citing *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990)).

Even if the trial court erred in overruling Appellant's objections, we will not reverse the judgment if the error was harmless. *See* Tex. R. App. P. 44.2. We review error in admitting extraneous offense evidence as non-constitutional error. *Casey v. State*, 215 S.W.3d 870, 885 (Tex. Crim. App. 2007). We will disregard non-constitutional error that does not affect a criminal defendant's substantial rights. *See* Tex. R. App. P. 44.2(b). "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *Schmutz v. State*, 440 S.W.3d 29, 39 (Tex. Crim. App. 2014). In our determination of whether error adversely affected the jury's decision, we consider everything in the record, including testimony, physical evidence, jury instructions, the State's theories and any defensive theories, closing arguments, and voir dire. *Id.*

Extraneous Conduct Evidence

Evidence of a crime, wrong, or other act is not admissible to prove a person's character to show that on a particular occasion the person acted in accordance with

12

the character. Tex. R. Evid. 404(b)(1). "Rule 404(b) sets out an illustrative, not exhaustive, list of exceptions to the prohibition against admitting evidence of extraneous offenses including 'proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'" *Daggett v. State*, 187 S.W.3d 444, 451 n.13 (Tex. Crim. App. 2005) (quoting Tex. R. Evid. 404(b)) (emphasis omitted); *Prible v. State*, 175 S.W.3d 724, 731 (Tex. Crim. App. 2005). The Court of Criminal Appeals has explained that "'Rule 404(b) is a rule of inclusion rather than exclusion.' The rule excludes only that evidence that is offered (or will be used) solely for the purpose of proving bad character and hence conduct in conformity with that bad character." *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009) (footnotes omitted) (quoting *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000) (discussing Fed. R. Evid. 404(b)).

"Whether extraneous offense evidence has relevance apart from character conformity, as required by Rule 404(b), is a question for the trial court." *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). In determining the admissibility of extraneous offenses or uncharged acts, courts first determine whether the evidence is relevant to a material issue in the case and second whether the relevant evidence should be admitted as an exception to Rule 404(b). *Rogers v. State*, 853 S.W.2d 29, 32-33 (Tex. Crim. App. 1993). A trial court's 404(b) ruling admitting evidence is

13

generally within the zone of reasonable disagreement "if there is evidence supporting that an extraneous transaction is relevant to a material, non-propensity issue." *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011) (citing *Powell*, 63 S.W.3d at 438). For example, the evidence may be admissible to rebut a defensive theory or when the defense "open[s] the door." *Powell*, 63 S.W.3d at 439; *Halliburton v. State*, 528 S.W.2d 216, 218 (Tex. Crim. App. 1975).

One of the main rationales for admitting extraneous conduct evidence is to prove the identity of the defendant. *Segundo v. State*, 270 S.W.3d 79, 88 (Tex. Crim. App. 2008) (citing *Castillo v. State*, 739 S.W.2d 280, 289 (Tex. Crim. App. 1987)). The trial judge has considerable latitude in determining that identity is disputed. *Id.* at 86 (citing *Page v. State*, 137 S.W.3d 75, 78 (Tex. Crim. App. 2004); *Lane v. State*, 933 S.W.2d 504, 519 (Tex. Crim. App. 1996)). Identity of the defendant is at issue when the defense cross-examines witnesses about their identification of the defendant or alleges that someone else committed the crime. *See Page v. State*, 213 S.W.3d 332, 336 (Tex. Crim. App. 2006); *Lane*, 933 S.W.2d at 519. Identity may also be placed in dispute by the defendant's opening statement or by affirmative evidence offered by the defense. *Segundo*, 270 S.W.3d at 86 (citing *Powell*, 63 S.W.3d at 439; *Page*, 137 S.W.3d at 78). The relevancy is usually that characteristics of the charged crime and the uncharged conduct are so distinctively similar that they

14

mark the crime as the work of a single individual. *Id.* at 88. No rigid rules dictate what constitutes sufficient similarities, and the common characteristics may be proximity in time and place, mode of commission of the crimes, the person's dress, or any other elements which mark both instances of conduct as having been committed by the same person. *Id.* (citing *Taylor v. State*, 920 S.W.2d 319, 322 (Tex. Crim. App. 1996). But if the similarities are generic and are merely typical to this type of crime, they will not constitute a "signature" crime. *Id.*; *see also Page v. State*, 125 S.W.3d 640, 649 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (no error in admitting evidence that defendant had possessed a black handgun prior to the offense charged because a witness had testified as to a description of the weapon); *Pena v. State*, 867 S.W.2d 97, 98-99 (Tex. App.—Corpus Christ 1993, pet. ref'd) (the use of the same car in an earlier burglary was sufficiently similar to the charged offense to justify its admission).

When undertaking a Rule 403 analysis, the trial court must, upon proper objection, balance or weigh the probative value of the evidence against unfair prejudice, confusion of the issues, misleading of the jury, and undue delay or needless presentation of cumulative evidence. *Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006); *see* Tex. R. Evid. 403. In balancing probative value and unfair prejudice under Rule 403, an appellate court presumes that the

probative value will outweigh any prejudicial effect. *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1991) (op. on reh'd). Rule 403 does not require that the trial court perform the balancing test on the record. *Distefano v. State*, 532 S.W.3d 25, 31 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd).

Analysis

Appellant's brief states that "[i]dentity was arguably brought into contention" at trial. The State argues that identity was "the central issue at trial." Appellant pleaded "not guilty." In a pretrial hearing, defense counsel told the court "[i]dentity is going to be the central issue in this case[.]" In Appellant's opening statement, his attorney stated "They have no evidence at all that Mr. Lagos was driving. And there's an important reason why? Because he wasn't. Somebody else was driving that vehicle. . . . The issue is who was driving that car." Defense counsel repeated this argument in closing and argued that none of the State's ninety exhibits "has anything to do with his presence there." Lagos himself testified that he did not drive the truck that struck Officer Chapman, that he had lent his truck to an associate, and that when Officer Chapman was struck, Lagos was with an old girlfriend. The record provides a reasonable basis for the trial court to have concluded that identity was an issue. *See Dabney v State*, 492 S.W.3d 309, 317 (Tex. Crim. App. 2016) (citing *Bass v. State*, 270 S.W.3d 557, 563 (Tex. Crim. App. 2008)) (explaining that a defense

16

opening statement could open the door to the admission of extraneous-offense evidence to rebut the defensive theory presented in the opening statement); *Segundo*, 270 S.W.3d at 86 (explaining that identity may be placed in dispute by a defendant's opening statement or cross-examination, or by evidence offered by the defense).

At the pretrial hearing, the State explained to the court that the extraneous conduct evidence regarded "the same exact truck, same exact VIN number, same exact area of town, [with] the same exact materials two months earlier with the defendant on camera photographed behind the wheel of this same truck." At trial, when the State sought admission of Sergeant Brockhoeft's testimony, the State explained the October 2015 police stop showed "[t]he defendant is driving the truck. It's the same VIN number. It's two months prior. And it's for a similar thing. . . . this is an incident that we believe proves identity in this case." The State also told the court that in his opening statement, defense counsel had argued there was no evidence that Lagos was driving, that someone else drove, and "[t]he issue is who was driving that car." The defense argued that the two instances of conduct were not similar enough to constitute an exception to Rule 404(b) because the October conduct was theft and the offense being tried was assault on a peace officer.

In overruling the defense objection, the court stated

> . . . I am looking at identity because this is a circumstantial evidence case. There was no one on the scene, an eyewitness that saw

17

this happening. So, identity is important. I'm looking at the theory of relevance, the MO, in which the pattern in characteristics of these crimes are so distinctively similar they constitute a signature or a pattern of some sort, their proximity in time and place. The motive, commission of the crimes, motive of duress of the perpetrator, any other element that marks both crimes of having been committed by the same person.

. . . .

I'm looking at the similarities. And the similarities can't be those just common to that type of crime. So, it's almost better that we don't have two burglaries or two whatever is going on here because what I'm looking at is similarities in the cars that are being driven. And that's what this evidence would show. Similarities in the theft of or the possession of roofing materials, which is what this other would show. And the proximity of all this in the same area, same -- pretty close to where the roofing company will be the materials. So, I'm overruling your objection.

Even assuming without deciding that the trial court erred in admitting Sergeant Brockhoeft's testimony about the October incident, on the record before us we conclude that the error was harmless. *See* Tex. R. App. P. 44.2. In addition to hearing the Sergeant's testimony, the jury also heard Pereyra testify that Lagos told her "he had run over a cop[]" while he and others were stealing roofing materials. The jury heard Juan Vargas testify that he went with Lagos to steal roofing materials on the night of Christmas 2015, after which Lagos called him and told him he had crashed into a police car, that he had hit a police officer, and that he wanted to go back and run over the officer again. Cell phone records put Lagos in the vicinity of

18

West End Lumber on the night of December 25-26, 2015. We conclude any error in admitting evidence of the 2015 incident had no substantial and injurious effect or influence in determining the jury's verdict nor did it affect a substantial right of Lagos. Thus, any such error must be disregarded. *See id.*; *Schmutz*, 440 S.W.3d at 39; *Taylor v. State*, 268 S.W.3d 571, 592 (Tex. Crim. App. 2008).

To the extent that Appellant argues on appeal that the extraneous conduct evidence was inadmissible under Rule 403, Appellant failed to make a separate Rule 403 objection at trial and, therefore, this issue was not preserved for our review. *See Green v. State*, 934 S.W.2d 92, 102 (Tex. Crim. App. 1996) (explaining that where appellant did not raise a separate trial objection based upon Rule 403, the issue was not properly presented for appellate review); *Montgomery*, 810 S.W.2d at 389 (the objecting party must make a 403 objection at trial that is separate from its Rule 404(b) objection); *see also Bekendam v. State*, 441 S.W.3d 295, 300 (Tex. Crim. App. 2014) ("the point of error on appeal must comport with the objection made at trial"). Appellant also failed to adequately brief this point on appeal. *See* Tex. R. App. P. 38.1(i); *see Lucio v. State*, 351 S.W.3d 878, 896 (Tex. Crim. App. 2011) (stating an inadequately briefed point of error presents nothing for review); *Montgomery*, 810 S.W.2d at 377 (explaining that the party opposing admission of evidence based on Rule 403 bears the burden "to not only demonstrate the proffered

evidence's negative attributes but to show also that these negative attributes 'substantially outweigh' any probative value[]").

We overrule Appellant's issue and affirm the trial court's judgment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on April 17, 2019
Opinion Delivered June 12, 2019
Do Not Publish

Before McKeithen, C.J., Horton and Johnson, JJ.